UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
LORRAINE LINSER-PARRINELLO,

                    Plaintiff,

                                              MEMORANDUM & ORDER
          -against-                           13-CV-4585(JS)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:       Charles E. Binder, Esq.
                     Law Offices of Harry J. Binder
                         and Charles E. Binder, P.C.
                     60 East 42nd Street, Suite 520
                     New York, NY 10165

For Defendant:       Arthur Swerdloff, Esq.
                     United States Attorneys Office
                     271 Cadman Plaza East, 7th Floor
                     Brooklyn, NY 11201

SEYBERT, District Judge:

          Plaintiff   Lorraine   Linser-Parrinello   ("Plaintiff")

commenced this action pursuant to Section 205(g) of the Social

Securities Act, as amended, 42 U.S.C. § 405(g), challenging

defendant   the   Commissioner   of   Social   Security's   (the

"Commissioner") denial of her application for disability insurance

benefits.     Pending before the Court are Plaintiff's motion and

the Commissioner's cross-motion for judgment on the pleadings.

(Docket Entries 20, 27.)   For the following reasons, Plaintiff's

motion is GRANTED, the Commissioner's motion is DENIED, and this

matter is REMANDED to the Commissioner for further consideration in accordance with this Memorandum and Order.

BACKGROUND

Plaintiff filed for Social Security Disability benefits on June 30, 2009, alleging that she has been disabled since January 1, 2005. (Pl.'s Br., Docket Entry 21, at 1.) Plaintiff attributes her disability to a number of maladies: fibromyalgia, Sjogren's syndrome, osteopenia, chronic bursitis of the left shoulder, irritable bowel syndrome (IBS), temporomandibular joint (TMJ) disorder, chronic deformity of her T8 vertebra, multiple disc herniations, left sciatic pain, and low back spasms. (R. at 123.) After her social security benefits application was denied on January 12, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. at 53-59; Pl.'s Br. at 1.) The hearing took place on November 15, 2010, in Jericho, New York before ALJ Zachary S. Weiss. (R. at 43, 50.) Plaintiff was represented by counsel at the hearing and she was the only witness who testified. (R. at 43.)

On November 18, 2011, the ALJ issued his decision finding that Plaintiff was not disabled. (R. at 50.) Plaintiff sought a review of the ALJ's decision by the Appeals Council, (R. at 205-209), and submitted additional evidence in support of her request,

(R. at 285-95).[1]  On June 26, 2013, the Appeals Council denied her request.  (R. at 1-6.)  Plaintiff now asks the Court to review the ALJ's decision.

The Court's review of the administrative record in this case will proceed as follows: <u>First</u>, the Court will summarize the relevant evidence that was presented to the ALJ; <u>second</u>, the Court will review the ALJ's findings and conclusions; <u>third</u>, the Court will summarize the additional evidence submitted to the Appeals Council; and <u>finally</u>, the Court will review the Appeals Council's decision.

## I.   <u>Evidence Presented to the ALJ</u>

### A.   <u>Non-Medical Evidence</u>

Plaintiff was born in 1961.  (Pl.'s Br. at 1.)  She has a high school degree and completed court reporting school in 1982.  (R. at 23.)  Plaintiff is divorced and has one child.  (R. at 21.)  She currently resides with her ex-husband, with whom she reconciled in 1998.  (R. at 21, 30.)

---

[1] With respect to the new evidence submitted to the Appeals Council, it is deemed part of the record and will be considered by the Court when determining if there is substantial evidence to support the Commissioner's final decision.  <u>See</u> <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996) ("[w]hen the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.")

Plaintiff previously worked as a court reporter and as a legal secretary for fifteen years. (R. at 23.) She testified that she stopped working in 2005, however, because of: (1) the dryness in her mouth caused by the Sjogren's syndrome; (2) her frequent need to use the bathroom due to her IBS; and (3) neck and back tightness and spasms. (R. at 23.) Plaintiff also testified that she cannot sit for more than one hour before her sciatica starts to tighten up, and she can stand for less than one hour before experiencing excruciating pain in her back. (R. at 26-27.) Plaintiff testified that she experiences constant pain at a level of 6-7 out of 10, which can increate to a 9-10 out 10 on a daily basis. (R. at 29.) She takes about six aspirin a day. (R. at 30.)

Nevertheless, Plaintiff is able to do light housework, such as wiping down the counters, making her bed, loading the dishwasher, and preparing meals. (R. at 32, 37.) Plaintiff walks two blocks around her neighborhood, for about 20 minutes, two to three times a week. (R. at 35-36.) She also goes shopping, but does so almost daily so that the bags are not too heavy. (R. at 32.) Plaintiff is able to dress herself, but she experiences pain in her left arm while doing so; Plaintiff is also able to wash herself without "too much trouble." (R. at 33-34.) Plaintiff testified that her ex-husband does the vacuuming and the laundry because she is unable to do so. (R. at 32.)

B.  <u>Medical Evidence</u>

    1.  Henry Monetti, D.O.

Plaintiff began seeing her primary care physician, Henry J. Monetti, D.O., in 2005.  (R. at 197.)  In a letter sent to the SSA, Dr. Monetti stated that Plaintiff has a "multitude of medical conditions" which have been diagnosed by x-rays, CAT scans, and MRI's.  (R. at 197.)  These conditions included: osteoarthritis, disc herniations, fibromyalgia, sciatica, tendonitis of the left arm, IBS, chronic TMJ, and Sjrogen's Syndrome.  (R. at 197.)  Dr. Monetti also stated that Plaintiff was physically limited due to chronic pain in her neck, back, and arms.  (R. at 197.)

On December 30, 2005, Dr. Monetti saw Plaintiff for chronic loose bowel movements.  (R. at 505.)  Dr. Monetti diagnosed Plaintiff with diverticulitis and prescribed Cipro and Buspar.  (R. at 505.)  On February 6, 2006, Plaintiff returned with complaints of pain in her lower left side, loose bowel movements, weakness, and fatigue.  (R. at 506.)  Dr. Monetti diagnosed her with IBS.  (R. at 506.)

On April 10, 2006, Plaintiff returned complaining of upper right quadrant pain, which had been occurring for six months.  (R. at 503.)  Dr. Monetti diagnosed possible endometriosis.  (R. at 503.)

On May 23, 2006, Plaintiff returned to Dr. Monetti complaining of left shoulder pain occurring over the course of a

few months.  (R. at 504.)  Plaintiff had full range of motion in the neck and the left shoulder, but Dr. Monetti noted that these areas were tender.  (R. at 504.)  On July 10, 2006, following an earlier x-ray, Dr. Monetti diagnosed Plaintiff with calcific bursitis of the left shoulder.  (R. at 433, 504.)  On October 23, 2006, Dr. Monetti again saw Plaintiff for left lower quadrant pain that had been occurring for a year.  (R. at 502.)  He diagnosed Plaintiff with IBS, diverticulosis, and possible endometriosis. (R. at 502.)

On October 19, 2007, an upper gastrointestinal and small bowel series was performed on Plaintiff.  (R. at 430.)  The interpreting physician, Sandhaya Singh, M.D., found no obvious bowel abnormalities except for two small diverticula, and no acid reflux was visible. (R. at 431.)  On October 20, 2007, Dr. Monetti noted that an upper gastrointestinal and small bowel series were normal.  (R. at 494.)  On April 7, 2008, Plaintiff complained of loose bowels after eating and Dr. Monetti again diagnosed her with IBS.  (R. at 489.)

On December 31, 2008, Plaintiff returned complaining of long standing abdominal pain and loose bowel movements and Dr. Monetti again diagnosed Plaintiff with IBS.  (R. at 487.)

On July 7, 2009, Plaintiff complained that she had been experiencing lower back pain for three weeks.  (R. at 481.)  Upon

examination, Dr. Monetti noted tenderness of the back part of the pelvis between the hips.  (R. at 481.)

On February 3, 2010, Plaintiff called Dr. Monetti's office complaining of severe abdominal pain and she was instructed to go to the emergency room.  (R. at 566.)  On February 5, 2010, Dr. Monetti saw Plaintiff in his office.  (R. at 566.)  Plaintiff stated that she had gone to the emergency room two days earlier with contraction type abdominal pain but that she was starting to feel better.  (R. at 566.)

In a medical assessment of ability to do work-related activities dated September 1, 2010, Dr. Monetti opined that Plaintiff could lift no more than five pounds for no longer than one hour "without interruption and difficulty." (R. at 568.)  Dr. Monetti further opined that Plaintiff could not stand, or walk for a total of more than one hour in an eight-hour work day.  (R. at 568.)  He also stated that Plaintiff could occasionally climb, stoop, kneel, balance, crouch, and crawl but that Plaintiff cannot sit, stand or walk for any significant period of time without interruption.  (R. at 569.)  Dr. Monetti concluded that any repetitive motion involving neck, back, and arms are extremely difficult for Plaintiff.  (R. at 570.)  In support of his assessment, Dr. Monetti listed Plaintiff's maladies: chronic compression deformity T8 vertebral disc herniations; Sjrogen's syndrome; osteopenia; acid reflux disease; fibromyalgia;

tendonitis of the left arm; IBS; chronic neck, back, and arm pain; chronic TMJ pain; and sciatic pain. (R. at 568-69.)

### 2. Peter Rumore, M.D.

On February 14, 2005, Plaintiff saw Peter M. Rumore, M.D., a rheumatologist. (R. at 312-314). Plaintiff complained of diffuse pains which she had been experiencing for many years. (R. at 312.) Specifically, Plaintiff had pain in the middle to lower area of her back. (R. at 312.) Plaintiff informed Dr. Rumore that she had a compression fracture at the TA vertebral body, dating back fifteen years. (R. at 312.) She also complained of pain in the back of her neck and upper back region, a low backache, and four hours of morning stiffness in her back and weakness in her hands. (R. at 312.) She told Dr. Rumore that she had bilateral TMJ pains for years, but denied any foot, ankle, knee, or heel problems. (R. at 312.) Additionally, Plaintiff reported having tennis elbow, which was cured with a local steroid injection and left shoulder bursitis in the past for which she had seen orthopedic surgeons. (R. at 312.)

After a physical examination, Dr. Rumore noted that Plaintiff had tight spastic muscles between the shoulders, but she he had no other fibromyalgia tender points. (R. at 313.) A joint examination showed tenderness of both wrists without swelling. (R. at 313.) Plaintiff's cervical spine had decreased right lateral flexion with mild pain; the dorsal spine was normal except

for pain around the TA region. (R. at 313.) An x-ray of Plaintiff's back showed mild scoliosis and suggested sclerotic changes around the right sacrociliac joint. (R. at 313.) Dr. Rumore diagnosed Plaintiff with arthralgias, myalgias, osteopenia with a T8 compression fracture, and a history of diarrhea. (R. at 313.)

On November 2, 2005, an MRI of Plaintiff's cervical spine revealed moderate disc slipping. (R. at 315.) Dr. Fiore reviewed the MRI and noted that Plaintiff's marrow appeared normal and the spinal cord was intact. (R. at 315.) Dr. Fiore noted that there was no spinal narrowing but indicated there was slight slipping of the vertebrae. (R. at 315.)

On November 2, 2005, Dr. Fiore conducted and reviewed an MRI of the thoracic spine. (R. at 316.) The MRI showed round back configurations and wedge deformity of the T8 vertebral body, consistent with a compression fracture of an undetermined age. (R. at 316.) There was no evidence of significant spinal canal encroachment, but moderate arthritic changes to the discs at the front and a slight disc bulge at the back were noted, with impingement on the neural canal. (R. at 316.) Dr. Fiore diagnosed Plaintiff with a round back deformity, degenerative arthritic changes, and chronic compression deformity of the T8 vertebral body with disc bulge posteriorly in T8, T9. (R. at 316.)

On March 6, 2009, Plaintiff returned to Dr. Rumore for follow-up related to Sjogren's syndrome. (R. at 377.) Dr. Rumore noted that Plaintiff had Sjogren's syndrome with a good response to Evoxac, but due to issues with cost he prescribed the generic pill, Pilocarpine. (R. at 378.) He also noted that Plaintiff's lymphnodes were no longer enlarged. (R. at 378.)

On June 8, 2009, Plaintiff followed up with Dr. Rumore complaining that she felt awful and was applying for disability. (R. at 374.) Dr. Rumore diagnosed Plaintiff with myalgia, myositis, and osteopenia[2] and referred her to physical therapy. (R. at 375.)

In a letter dated March 25, 2011, Dr. Peter Rumore wrote that he first saw Plaintiff in February, 2005 for generalized muscle and joint aches, neck and back pain, and dryness of the eyes and mouth. (R. at 641.) At that time Plaintiff had been diagnosed with fibromyalgia, Sjogren's syndrome, and degenerative disease of the lower spine. (R. at 641.) Dr. Peter Rumore explained that these conditions were chronic. Moreover, while medications for mouth dryness had helped Plaintiff's condition, medication she took for arthritic conditions and fibromyalgia had been minimally successful. (R. at 641.)

---

[2] On June 8, 2009, Plaintiff underwent a bone density scan which revealed osteopenia in her neck. (R. at 380-86.)

### 3.  William Cohn, M.D. and Gary R. Bernstein, M.D.

On February 6, 2006, Plaintiff saw Dr. William Cohn at Long Island Digestive Disease Consultants for lower left abdominal quadrant pain.  (R. at 350.)  Dr. Cohn concluded that Plaintiff did not have diverticulitis and suggested she see a gynecologist. (R. at 351.)

On February 11, 2006, Plaintiff went to St. Charles hospital because she was suffering from abdominal pain.  (R. at 323.)  A CT scan of her abdomen and pelvis revealed mild thickening of the sigmoid colon, and she was diagnosed with scattered diverticula.  (R. at 323.)  However, an April 13, 2006, CT scan of Plaintiff's abdomen and pelvis found no abnormalities.  (R. at 320.)

On April 4, 2007, Plaintiff returned to Long Island Digestive Disease Consultants and saw Dr. Gary Bernstein.  (R. at 340.)  She complained of lower left quadrant pain occurring throughout the day, which could not be relieved through bowel movements or passing gas.  (R. at 340.)

### 4.  Ray A. Haag, M.D.

On May 4, 2006, Plaintiff saw Dr. Ray A. Haag, an orthopedic surgeon.  (R. at 324.)  She told him that she had been in a car accident on May 2, 2006, and developed neck and back soreness and stiffness.  (R. at 324.)  Plaintiff was diagnosed with degenerative changes, osteopenia, and compression deformity

of the T8 vertebra, prior to the motor vehicle accident and now has a cervical and dorsal sprain as a result of the accident with underlying degenerative changes in her neck. (R. at 325.) She was also diagnosed with chronic tendonitis of the left shoulder. (R. at 325.) Dr. Haag concluded that Plaintiff was partially disabled at that time. (R. at 325.)

     5.   <u>Patricia Burns, M.D.</u>

     On October 23, 2006, Patricia Burns, M.D. saw Plaintiff and diagnosed her with mild elevated white blood cell count. Tests were conducted and Plaintiff was informed that this may be related to Plaintiff's smoking habit and her symptoms appeared to have improved since she cut back on smoking. (R. at 327-30.)

     6.   <u>Michael H. Shanik, M.D.</u>

     On October 12, 2007, Michael H. Shanik, M.D. saw Plaintiff for thyroid nodules. (R. at 334.) Plaintiff's symptoms included: anxiety, chronic diarrhea, recent weight loss, dry eyes and mouth, and joint discomfort. (R. at 335.) Dr. Shanik stated that it was unlikely that these symptoms were due to thyroid disease and that her thyroid-stimulating hormone levels were normal. (R. at 335.)

     7.   <u>Edward Samuel, M.D.</u>

     On November 30, 2007, Dr. Edward Samuel of North Shore Hematology/Oncology Associates saw Plaintiff. (R. at 336-37.) Plaintiff was suffering from night sweats, swollen glands, and

mild weight loss.  (R. at 336.)  Dr. Samuel drew blood to rule out lymphoma, but the cause of Plaintiff's symptoms remained unclear. (R. at 337.)   Plaintiff was sent for a CT scan of the chest, abdomen, and pelvis with contrast, in addition to, a CT scan of her neck.  (R. at 337.)  A CT scan of the neck, chest, abdomen and pelvis revealed a mildly prominent left lymph node.  (R. at 339.)

        8.   <u>Arain Nawaz, M.D.</u>

On October 31, 2007, Arain Nawaz, M.D. saw Plaintiff at Gastroenterology and Endoscopy Center. (R. at 352.)  Plaintiff's physical examination was unremarkable.  (R. at 352.)  Dr. Nawaz diagnosed Plaintiff with IBS and advised her to continue taking Librax.  (R. at 352.)

        9.   <u>Ali S.  Karakurum, M.D.</u>

On January 30, 2008, Plaintiff visited Sound Gastroenterology, P.C., after being referred by Dr. Monetti.  (R. at 353.)   Dr. Ali Karakurum, M.D., diagnosed Plaintiff with abdominal pain, diarrhea, and rectal bleeding and recommended a colonoscopy.  (R. at 354.)

On February 15, 2008, Dr. Karakurum saw Plaintiff for black liquid stools and abdominal pain.  (R. at 363.)  Dr. Karakurm noted that the black stools were most likely due to Plaintiff's Pepto-Bismol intake.  (R. at 364.)  Dr. Karakurm recommended that Plaintiff undergo an upper endoscopy and advised her to take

Prilosec over-the-counter and to follow up in one week.  (R. at 364.)

On March 3, 2008, Plaintiff saw Dr. Karakurum for a follow-up visit.  (R. at 359.)  The results of a colonoscopy and small bowel series test were normal.  (R. at 359.)  Dr. Karakurum diagnosed Plaintiff with IBS and proscribed Amitriptyline.  (R. at 360.)

On April 14, 2008, Dr. Karakurum saw Plaintiff.  This time she complained of diarrhea and green stool.  (R. at 361.) Plaintiff stated that she had not taken Amitriptyline as prescribed. (R. at 361.)  Plaintiff was prescribed Questran 4g and Anusol HC.  (R. at 362.)

10.  Shamim Khan, M.D.

On June 20, 2008, Plaintiff saw Shamim Khan, M.D., a cardiologist, for an initial consultation.  (R. at 366.)  Plaintiff complained of chest discomfort, sharp and pressure-like in character lasting for about ten minutes at a time without radiation.  (R. at 366.)  Plaintiff also complained of daily heart palpitations lasting one to two minutes and occasionally accompanied by dizziness.  (R. at 366.)  Plaintiff also stated that she had experienced a heavy feeling in her legs and could not walk.  (R. at 366.)  Dr. Khan diagnosed Plaintiff with palpitations, atypical chest pain, and a history of dizziness.

14

(R. at 368.)  Dr. Khan recommended further testing and strongly advised Plaintiff to quit smoking.  (R. at 368.)

### 11.  Laurence Mermelstein, M.D.

On March 3, 2011, Laurence Mermelstein, M.D. saw Plaintiff for an initial consultation.  (R. at 615.)  Plaintiff's chief complaints were: cervical pain, shoulder pain, upper extremity pain, upper extremity numbness, lumbar pain, and left leg pain.  (R. at 615.)  Plaintiff stated that she was trying to get Social Security disability benefits.  (R. at 615.)  After examining Plaintiff, Dr. Mermelstein noted increased rounding of the back and exaggerated cervical curving, percussive tenderness, and paraspinal tenderness.  (R. at 616.)  Dr. Mermelstein also noted that moving was painful for Plaintiff during axial extension. (R. at 616-17.)  Plaintiff's shoulder range of motion was within the normal range.  (R. at 616.)  Examination of the lumbar spine showed sciatic notch tenderness on the left side.  (R. at 617.) Dr. Mermelstein noted that there was no gross weakness in the lower extremities, reflexes were within normal limits, and there were no sensory deficits.  (R. at 617.)  Hip motion was painless and within normal limits and other physical testing was normal.  (R. at 617.)

Dr. Mermelstein diagnosed Plaintiff with cervical degenerative disc disease, thoracic degenerative disc disease, dorsal fracture closed, cervical sprain, and acquired kyphosis. (R. at 617.)  Dr. Mermelstein noted that Plaintiff's issues were

15

chronic and unlikely to improve.  (R. at 617.)  He therefore concluded that Plaintiff was unable to return to work.  (R. at 617.)

On March 24, 2011, Dr. Mermelstein saw Plaintiff and reviewed an MRI of the cervical and thoracic spine.  The MRI showed multiple areas of severe degenerative disc disease and deformity. (R. at 619, 621.)  In addition, a 6-millimeter right thyroid nodule was also noted.  (R. at 623.)

The MRI of the thoracic spine showed a T8 vertebral body compression fracture with an approximately 40% loss of height. (R. at 625.)  Disc herniations deforming the thecal sac abutting the spinal cord were noted, as well as increased thoracic kyphosis centered at the T8 vertebral body level.  (R. at 625.)  Multi-level disc degenerative changes were noted.  (R. at 625.)  At the follow-up visit, Dr. Mermelstein recommended pain management and a rheumatology evaluation, but he did not recommend surgery.  (R. at 621.)  Dr. Mermelstein again noted that Plaintiff was unable to return to her own occupation.  (R. at 621.)

On September 30, 2011, Dr. Mermelstein sent a detailed written report regarding Plaintiff's treatment to the ALJ.  (R. at 744.)  He stated in the report that he began seeing Plaintiff on March 3, 2011, and at that time she complained of neck pain, bilateral shoulder pain, bilateral upper extremity pain and numbness, and back and leg pain.  (R. at 744.)  Dr. Mermelstein

stated that, in his medical opinion, Plaintiff was totally and permanently impaired and unable to return to her usual occupation due to multiple areas of severe degenerative disc disease and deformity, which could not be remedied with surgery.  (R. at 745.)

      12.  <u>Waseem Mir, M.D.</u>

On March 29, 2011, Dr. Waseem Mir, M.D. began seeing Plaintiff.  (R. at 644.)  Dr. Mir diagnosed Plaintiff with Sjogren's disease, osteopenia, and osteoarthritis of multiple areas. (R. at 644.)  On April 12, 2011, a bone density test showed osteopenia of the spine and femur. (R. at 646.)

On April 14, 2011, Dr. Mir sent a letter to the ALJ stating that Plaintiff was under his care and that she suffers from cervical and thoracic osteoarthritis with a history of a compression fracture.  (R. at 640.)  He stated that Plaintiff has chronic and permanent back pain and the she is unable to work due to her condition.  (R. at 640.)

On September 15, 2011, Dr. Mir's medical records coordinator sent a letter explaining that Dr. Mir had only seen Plaintiff for three visits over the course of about one month and could not provide a detailed narrative of Plaintiff's impairments going back to 2008.  (R. at 733.)

On October 13, 2011, Dr. Mir sent a third letter to the ALJ.  (R. at 746.)  He reported that he was seeing Plaintiff for management of her chronic pain secondary to osteoarthritis of the

17

cervical, thoracic and lumbar spine. (R. at 746.) He stated that in his medical opinion, Plaintiff could not return to work. (R. at 746.)

### 13. Mike Pappas, D.O.

On December 17, 2009, Mike Pappas, D.O., an SSA consultative physician, saw Plaintiff for an examination related to her SSA disability claim. (R. at 553.) Plaintiff complained that she suffered from neck pain, sometimes associated with numbness in her fingers, and left arm pain. (R. at 553.) Plaintiff also complained of a collapsed vertebrae in her mid back, lower back pain, and sciatica-like symptoms in her left leg. (R. at 553.) Plaintiff reported a history of fibromyalgia and TMJ. (R. at 553.) Plaintiff stated that for two to three years she had been experiencing bursitis in her left arm, and more recently she experienced pain in her right arm and has difficulty lifting. (R. at 553.) She also reported her history of osteopenia, Sjorgren's syndrome, and IBS. (R. at 553.)

Dr. Pappas diagnosed Plaintiff with neck pain with a history of herniated nucleus pulposus and radicular symptoms; vertebral compression fracture of the thoracic spine; sciatica; fibromyalgia; left shoulder bursitis; TMJ; osteopenia; Sjogren's syndrome; and IBS. (R. at 556.) He opined that Plaintiff was mildly limited in her ability to stand, walk, reach, push, pull,

lift, climb, and bend but that she had no restrictions with regard to sitting.  (R. at 556.)

### 14.  Donald I. Goldman, M.D.

On February 22, 2011, Donald I. Goldman, M.D., an orthopedist, reviewed Plaintiff's medical record at the request of the ALJ, but did not conduct a physical examination of Plaintiff. (R. at 593-600.)  Dr. Goldman opined that Plaintiff could lift or carry up to 20 pounds continuously, up to 50 pounds occasionally, and could sit, stand, and walk for 8 hours a day.  (R. at 593-94.) However, Dr. Goldman noted that Plaintiff's ailments related to rheumatology, not orthopedics (R. at 598.)  On July 11, 2011, Dr. Goldman provided another statement that Plaintiff had no functional orthopedic limitations, but that that she could have other limitations that were beyond his area of expertise.  (R. at 732.)

### 15.  C. Alexander III, M.D.

On May 13, 2011, H.C. Alexander III, M.D., a consultative rheumatologist, reviewed Plaintiff's medical records.  (R. at 657-66.)  He noted the following impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the thoracic spine, compression fracture of the T8, bursitis of the left shoulder, chest pain, hypothyroidism, retroperitoneal lymphadenopathy, osteopenia, IBS, colon diverticula, and fibromyalgia.  (R. at 659-60.)  He concluded, however, that no

single impairment or combination of impairments were the equivalent of any impairment described in the Listing of Impairments necessary to receive Social Security benefits. (R. at 660.)

Dr. Alexander opined that Plaintiff could lift or carry up to 10 pounds frequently and up to 20 pounds occasionally, could sit for 2 hours without interruption, and could stand or walk for 30 minutes without interruption. (R. at 662.) In an eight-hour workday, Dr. Alexander, stated that Plaintiff could sit for 6 hours, stand for 4 hours, and walk for 4 hours. (R. at 662.) Further, he opined that Plaintiff could occasionally engage in postural activities, not including climbing ladders or scaffolds. (R. at 664.)

III. Decision of the ALJ

After reviewing the evidence in the record, the ALJ issued a decision on November 18, 2011, finding that Plaintiff was not disabled. (R. at 43-50.) The ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms" were inconsistent with (1) medical evidence in the record and (2) Plaintiff's testimony indicating that she was capable of performing tasks such as walking around her

neighborhood, exercising using weights, and traveling five hours to visit her daughter (R. at 47-49.)

In reaching his decision, the ALJ gave "significant weight" to Dr. Goldman, a non-treating physician, explaining that Dr. Goldman's opinion was "supported by and consistent with the substantial evidence of the record." (R. at 49.) The ALJ also afforded "some weight" to the opinion of Dr. Alexander, a non-treating physician. (R. at 49.) However, the ALJ explained that he gave "little weight" to the opinion of Drs. Monetti and Mir, both treating physicians, because their opinions were "not consistent with the substantial evidence of [the] record." (R. at 49.) Finally, the ALJ gave "little weight" to the opinion of Dr. Mermelstein, a treating physician, because his opinion was "vague and inconsistent with the claimant's admitted activities of daily living and work activities as well as the substantial evidence of the record." (R. at 49.) The ALJ also noted that Dr. Mermelstein only began treating Plaintiff in March 2011 and was unable to provide clarifications on Plaintiff's physical limitations when asked to do so. (R. at 49-50.)

Plaintiff submitted a letter to the Appeals Council seeking a review of the ALJ's decision along with additional evidence in the form of (1) a report from Suffolk Medical Imaging dated April 16, 2002, and (2) a report from John T. Mather Memorial Hospital Imaging dated June 23, 2006. (R. at 6.) The report from

Suffolk Medical Imaging indicated that on April 26, 2002, Plaintiff underwent a bone density scan, which showed normal bone mineral density of the lumbar spine and osteopenia of the left femoral neck. (R. at 748.) The John T. Mather Memorial Hospital imaging report submitted to the Appeals Council, reflected that Plaintiff was diagnosed with calcific bursitis of the left shoulder. (R. at 749.) On June 26, 2013, the Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. at 1-3.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. at 1.)

IV. <u>Procedural History</u>

Plaintiff commenced this action on August 9, 2013. (Docket Entry 1.) The Commissioner filed the administrative record on February 11, 2014, and her Answer on February 14, 2014. (Docket Entries 15, 16.) On April 14, 2014, Plaintiff moved for a judgment on the Pleadings and on August 7, 2014, the Commissioner cross-motioned for judgment on the pleadings. (Docket Entries 20, 27.) These motions are presently before the Court.

DISCUSSION

I. <u>Standard of Review</u>

In reviewing the ruling of the ALJ, this Court will not determine <u>de</u> <u>novo</u> whether Plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different

22

decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560. If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).

## II. Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive disability benefits. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. § 423(a), (d).  A claimant is disabled under the Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  Id.  § 423(d)(2)(A).

The Commissioner must apply a five-step analysis to determine whether a claimant is disabled as defined by the Act. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011).  First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities.  Id.

§ 404.1520(a)(4)(ii). <u>Third</u>, the claimant must show that his impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. <u>Id.</u> § 404.1520(a)(4)(iii). <u>Fourth</u>, if his impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity ("RFC") to perform tasks required in his previous employment. <u>Id.</u> § 404.1520(a)(4)(iv). <u>Fifth</u>, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. <u>Id.</u> § 404.1520(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. <u>See</u> <u>Shaw v. Chater</u>, 221 F.3d at 132; <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." <u>Boryk ex rel. Boryk v. Barnhart</u>, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citing <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983)).

25

Here, the ALJ performed the above analysis and found
that Plaintiff had not engaged in substantial gainful activity
since December 31, 2009, and that she had the following severe
impairments: cervical spine disorder, thoracic spine disorder,
lumbar spine disorder, osteopenia, irritable bowel syndrome,
fibromyalgia, retroperitoneal lymphadenopathy and bursitis of the
left shoulder. (R. at 45.) The ALJ next determined that none of
Plaintiff's impairments or any combination of her impairments were
the medical equivalent of any impairment enumerated in Appendix 1
of the Regulations. (R. at 46.) Thus, the ALJ found that Plaintiff
was capable of performing her past work as a court reporter, as
she had the RFC to perform a full range of medium work. (R. at
50.) Plaintiff takes issue with the ALJ's final determination.
Specifically, Plaintiff argues that (1) the ALJ did not follow the
treating physician's rule with respect to Drs. Monetti and Mir and
(2) the ALJ did not properly assess Plaintiff's credibility.
(Pl.'s Br. at 12-20.) The Court will address these arguments in
turn below.

A.   Treating Physician Rule

Plaintiff first argues that remand is required because
the ALJ did not properly apply the treating physician rule to Drs.
Monetti and Mir's medical opinions. (Pl.'s Br. at 12-16.) The
Commissioner counters that the ALJ properly assigned Drs. Monetti
and Mir's opinions "little weight." (Comm'r's Br., Docket Entry

28, at 26-32.) Because the ALJ did not clearly and fully identify

his reasons for giving Dr. Monetti's opinion little weight, this

matter must be remanded to the Commissioner for further

proceedings.

According to the "treating physician rule," the medical

opinions and reports of a claimant's treating physicians are to be

given "special evidentiary weight." Clark v. Comm'r of Soc. Sec.,

143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations

state:

> Generally, we give more weight to opinions
> from your treating sources . . . . If we find
> that a treating source's opinion on the
> issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the
> other substantial evidence in your case
> record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). When an ALJ does not accord

controlling weight to the medical opinion of a treating physician,

the ALJ "must consider various 'factors' to determine how much

weight to give to the opinion." Halloran v. Barnhart, 362 F.3d

28, 32 (2d Cir. 2004) (citation omitted); see also Schnetzler v.

Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). These factors

include:

> (1) the length of the treatment relationship
> and frequency of the examination; (2) the
> nature and extent of the treatment
> relationship; (3) the extent to which the
> opinion is supported by medical and laboratory

> findings; (4) the physician's consistency with
> the record as a whole; and (5) whether the
> physician is a specialist.

Schnetzler, 533 F. Supp. 2d at 286; see also 20 C.F.R.
§ 404.1527(d)(2); Halloran, 362 F.3d at 32.  The ALJ must "set
forth [his] reasons for the weight [he] assigns to the treating
physician's opinion." Shaw v. Chater, 221 F.3d 126 (2d Cir. 2000);
see 20 C.F.R. § 404.1527; see also Snell, 177 F.3d at 134 (2d Cir.
1999) ("[t]he requirement of reason-giving exists, in part, to let
claimants understand the disposition of their cases [especially
when unfavorable].  A claimant . . . who knows that her physician
has deemed her disabled, might be especially bewildered when told
by an administrative bureaucracy that she is not, unless some
reason for the agency's decision is supplied.").

Here, the ALJ found that Dr. Monetti's opinion was
entitled to "little weight" because it was "not consistent with
the substantial evidence of the record." (R. at 49.)  However,
Dr. Monetti was the Plaintiff's primary care physician, and thus
a treating physician.  As this Circuit held in 2004 and affirmed
in 2012, "[i]t is not enough for the ALJ to simply say that [a
treating physician's] findings are inconsistent with the rest of
the record.  The ALJ [must] provide reasons which explain that
inconsistency with these other parts." See McLean v. Astrue, No.
08-CV-4989, 2012 WL 1886774, at *7 (E.D.N.Y. May 23, 2012) (citing
Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004)).

The Commissioner contends that "the abundance of normal physical examinations; the unremarkable MRIs, CT scans, x-rays, and gastrointestinal studies; and the opinions of Drs. Goldman, Alexander, and Pappas, all of which were inconsistent with the opinion of Dr. Monetti" support the ALJ's decision to give Dr. Monetti's opinion "little weight." (Comm'r's Br. at 29.) However, the ALJ merely concluded in his decision that Dr. Monetti's opinion was "not consistent with the substantial evidence of record," without discussing what specific evidence he was referring to and without addressing any of the factors for determining how much weight to afford a treating physician's opinion. (R. at 49.) The ALJ's failure to explain why he gave Dr. Monetti's opinion little weight was an error that requires remand. On remand, the ALJ should explain why Dr. Monetti's opinions regarding Plaintiff's disabilities deserved "little weight" and were inconsistent with the record. See Snell, 177 F.3d at 134 (2d Cir. 1999) (remanding "for a statement of the reasons on the basis of which [a treating physician's] finding of disability was rejected"); see also, Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) (holding that "it is not enough for the ALJ to simply say that [the treating physician's] findings are inconsistent with the rest of the record").[3]

---

[3] Plaintiff also contends the ALJ committed an error when it

B. <u>Credibility</u>

Plaintiff argues that the ALJ did not properly assess Plaintiff's credibility. (Pl.'s Br. at 16.) The Court disagrees. "'[T]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . .'" <u>Mollo v. Barnhart</u>, 305 F. Supp. 2d 252, 263-64 (E.D.N.Y. 2004) (<u>quoting Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979) ; <u>Fiumano v. Colvin</u>, No. 13-CV-2848, 2013 WL 5937002, at *9 (E.D.N.Y. Nov. 4, 2013) ("An ALJ is not required to accept a claimant's testimony regarding the severity and persistence of his symptoms as true, but rather can evaluate the credibility of a claimant to arrive at an independent judgment based on the medical findings and other evidence"). Here the ALJ found that the Plaintiff's testimony regarding her "activities of daily living" contradicted her claim that she is disabled. (R. at 49.) The ALJ then provided specific examples of activities Plaintiff engaged in which tend to show that she is not

---

rejected the opinion of Dr. Mir, a treating physician, and provided only a "boiler plate" explanation. (Pl.'s Br. at 13.) However, the ALJ explained that it gave little weight to Dr. Mir's opinion because, inter alia, "Dr. Mir indicated that he had treated the claimant for less than one month and that he was unable to answer most of the questions regarding the claimant's medical impairments prior to treatment." (R. at 49.) The Court finds that with respect to Dr. Mir, the ALJ's opinion sufficiently articulated good reasons for giving Dr. Mir's opinion little weight, consistent with the factors enumerated in 20 C.F.R. § 404.1527(d)(2).

disabled.  (R. at 49.)  Just because Plaintiff disagrees with the ALJ's analysis of the evidence does not mean the ALJ improperly assessed the Plaintiff's credibility.

CONCLUSION

For the foregoing reasons, Plaintiff's motion is GRANTED, the Commissioner's cross-motion is DENIED.  This action is REMANDED to the ALJ for further proceedings consistent with this Memorandum and Order.  The Clerk of the Court is directed to mark this matter CLOSED.


SO ORDERED


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Date: March __31__, 2015
      Central Islip, New York